**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **Case No. 7:24-CR-00020** |
| | ) | |
| JEFFREY JAVONTAE KNIGHT, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S SENTENCING MEMO

Jeffrey Knight has been searching for home for a long time. Having just turned 27, he has never had a place, or truly a family, to call his own. It is inaccurate to say that Mr. Knight has lost his way, because he has been lost most of his life. But with redemption, which only the Court is in the position to provide to Mr. Knight; he can be provided with a semblance of a path forward.

Mr. Knight respectfully requests the Court sentence him to 150 months incarceration and 5 years supervised release. There is no rhyme nor reason to require Mr. Knight to serve more than 12.5 years behind bars.

## *A LOST CHILD*: MR. KNIGHT'S HISTORY AND CHARACTERISTICS

As a boy, Mr. Knight grew up in anything but a stable family. He was not raised by his father, as his Dad was often away, serving the Navy, and did not have much to do with him. Mr. Knight's Mom was his world, but despite Mr. Knight's fond memories of his mother, she was not there for him the way one would expect. She was in and out of prison, completely upending Mr. Knight's childhood, sending him from home to home.

| Knight, Candace | | Criminal | Revoc-Grn Lar W.Frd 18.2-95 | 10/14/2003 |
|---|---|---|---|---|

| *rmation* | **Offense 1** |
|---|---|
| e: Criminal Court | ◦ Categories: FRAUD |
| h: 09/1966 | ◦ Case Number: 800CR98F0059902 |
| 1-XXXX | ◦ Case Type: FELONY |
| 3-6121-2943 | ◦ Case Filing Date: 10/14/2003 |
| A | ◦ Offense Town: SUFFOLK CIRCUIT |
| VB1264200592906379476800CR98F005990220031014 | ◦ Offense Date: 05/01/1996 |
| 10/14/2003 | ◦ Appeal Date: 01/06/2004 |
| CK | ◦ Date: 10/23/2003 |
| e | ◦ Court Description: SUFFOLK CIRCUIT |
| : Virginia | ◦ Court Disposition: SENTENCE/PROBATION REVOKED |
| | ◦ Court Disposition Date: 12/08/2003 |
| | ◦ Court Level/Degree: FELONY |
| | ◦ Court Offense: REVOC-GRN LAR W.FRD 18.2-95 |
| | ◦ Court Statute: 19.2-306 |

| Criminal | Grand Larceny | 10/28/1998 |
| --- | --- | --- |

**Offense 1**
- Categories: THEFT
- Case Number: 800CR98F0059900
- Case Type: FELONY
- Case Filing Date: 10/28/1998
- Offense Town: SUFFOLK CIRCUIT
- Offense Date: 05/01/1996
- Date: 10/31/1998
- Court Description: SUFFOLK CIRCUIT
- Court Disposition: GUILTY
- Court Disposition Date: 03/03/1999
- Court Level/Degree: FELONY
- Court Offense: GRAND LARCENY
- Court Statute: 18.2-95/63.1-12
- Jail: Max: 4 Years

Candace Knight,[1] in and out of trouble with the law, Jeffrey Knight Sr. was not interested in raising his son, and Mr. Knight's older siblings with their own issues with the law, left Mr. Knight few role models with whom to look up.[2]

Indeed, Mr. Knight's older brother, Anthony Reese, got in trouble for among other issues, malicious wounding, assault and battery by a mob, and assault and battery of a law enforcement officer, from the time Mr. Knight was 10-13 years old.

It is lucky that Mr. Knight realized violence was not the answer and there is no indication in any of his past nor criminal history that he has ever followed in these footsteps.

---

[1] Mr. Knight has her name tattooed, but misspelled "Candice."

[2] Further proof of Mr. Knight's chaotic upbringing is shown by Mr. Knight's mistake in the PSR. He believed his mother was arrested when he was about 5 years old for malicious wounding. However, records show that around this time his mother had her probation revoked for a grand larceny charge, and it was his sister, Taimailai Reese who went away around that time for malicious wounding.



2

| Malicious Wounding | 07/24/2008 |
|---|---|

**Offense 1**
- Categories: ASSAULT_AGGRAVATED
- Case Number: 550CR0800309700
- Case Type: FELONY
- Case Filing Date: 07/24/2008
- Offense Town: CHESAPEAKE CIRCUIT
- Offense Date: 05/02/2008
- Date: 05/02/2008
- Court Description: CHESAPEAKE CIRCUIT
- Court Disposition: GUILTY
- Court Disposition Date: 04/14/2009
- Court Level/Degree: FELONY
- Court Offense: MALICIOUS WOUNDING
- Court Statute: 18.2-51
- Jail: Max: 12 Months

| Assault & Batter By Mob | 07/24/2008 |
|---|---|

**Offense 1**
- Categories: ASSAULT_OTHER
- Case Number: CR08003097-00
- Case Filing Date: 07/24/2008
- Offense Date: 05/02/2008
- Date: 05/02/2008
- Court Costs: 160900
- Court Description: CIRCUIT
- Court Disposition: GUILTY Status:GUILTY PLEA
- Court Disposition Date: 04/14/2009
- Court Level/Degree: MISDEMEANOR
- Court Offense: ASSAULT & BATTER BY MOB
- Court Plea: GUILTY
- Court Statute: 18.2-42
- Jail: Max: 12 Months

During these troubled times, Mr. Knight's mother tried to raise Mr. Knight with the resources she had cobbled together from welfare, food stamps, and money she earned, died at the very young age of 41.[3] Candace Knight was gone, and Mr. Knight Sr. didn't want his son, so young Jeffrey was sent to an aunt. Mr. Knight dropped out of school while living with his aunt and moved in with his older sister, who is only 13 years older than Mr. Knight.

---

[3] The depth of Mr. Knight's love for his mother is indicated by his biggest concern upon arrest. Every time he meets with Counsel, he requests the return of only one thing seized by the police upon his arrest – a necklace/locket that belonged to his mother.

3



Unfortunately, Mr. Knight's aunt also passed away, right before Mr. Knight began to get in trouble.



Rudderless, lost, with no one to look up to, Mr. Knight bounced from his mother's home to his father's home (briefly) to his aunt's home to his sister's home, to finally, on his own. Left to figure life out: without a degree, without a job, without anyone to steer him in any sort of direction.

Any one of these traumatic childhood upheavals were likely to change the trajectory of Mr. Knight's life. Experiences such as poverty, exposure to drugs at a young age, and a parent going to prison are called "Adverse Childhood Experiences (ACEs) and the more a child experiences the more likely the person is to experience things like high-blood pressure, depression (or other mental health issues), substance abuse, poor academic achievement, and even more likely to be incarcerated.[6] Such a toxic combination of childhood poverty and upheaval actively changes the brain.

---

[4] Ms. Candace Knight's date of death as indicated on LEXIS People Search.
[5] Ms. Catherine Jones' date of death as indicated on LEXIS People Search.
[6] See *ACEs and Toxic Stress: Frequently Asked Questions*, CENTER ON THE DEVELOPING CHILD HARVARD UNIVERSITY, Aug. 3, 2018, https://developingchild.harvard.edu/resources/infographics/aces-and-toxic-stressfrequently-asked-questions/; see also O. Ashekun, A. Zern, et al., *Adverse Childhood Experiences and Arrest*

> A consensus of scientific evidence demonstrates that high doses of cumulative adversity experienced during critical and sensitive periods of early life development – without the buffering protections of trusted, nurturing caregivers and safe, stable environments – can lead to long-term disruptions in brain development and immune, hormonal, and metabolic systems, acting through genetic regulatory mechanisms. This condition is now known as the toxic stress response.[7]

This is not to say Mr. Knight was doomed to commit the crimes that he committed in his early 20s or the one for which he is before the Court or that he had no hope, but it should certainly mitigate, to some extent, his actions, as he has struggled in a way that not many people can understand. He was lost since he was a child and had no one to teach him to grow up.

Then in 2018, after a serious car accident, Mr. Knight was prescribed and became addicted to opiates, the exact same year Mr. Knight first got in trouble with the law for possession of cocaine and heroin.[8]

"Stigmatization of someone labeled a criminal, according to one criminologist, results in 'disintegrative shaming in which no effort is made to reconcile the offender with the community.'"[9] At the young age of 20, Mr. Knight was saddled with the damaging label of "criminal," never to be seen as a true member of the community again. Of course, Government will argue that Mr. Knight did this to himself by possessing cocaine and selling heroin and this is true, however, that argument ignores Mr. Knight's age at the time of these incidents, his addiction that he was newly struggling with, and the fact that this high-school dropout, with no stable job, no family support, and no home, likely did not see any other way to support himself.

---

*Rates among Individuals with Serious Mental Illnesses*, JAAPL, Jun. 2023, https://jaapl.org/content/early/2023/06/05/JAAPL.220096-22.

[7] *The Science of ACEs & Toxic Stress*, ACES AWARE, https://www.acesaware.org/ace-fundamentals/the-science-ofaces-toxic-stress/.

[8] Of note, a year later, his older brother, Anthony Reese, was convicted and sentenced for possession with intent to distribute heroin. Roanoke City Circuit Court, CR19000271-00. When this is the only behavior someone is raised around and is modeled, it is hard to paint that person as a dangerous criminal who is purposefully shirking the edicts of the law.

[9] DAN CANON, PLEADING OUT, pg 72, (2022).

Drugs were not something that assisted Mr. Knight with a flashy lifestyle but something that, although antithetical to what we think of when we think of a moral lifestyle, provided Mr. Knight the means to just live. He was living on the bare minimum.

At the age of 20, when many young men and women are finding themselves despite mistakes brushed aside while in college, Mr. Knight was first convicted of these drug crimes. Either of which, unbeknownst to a young and lost Mr. Knight, could later become the basis for the punishing and cruel 21 U.S.C. § 851 mandatory minimum penalty. The indiscretion of a youth at age 20, rather than just used as a basis of mandatory minimum penalties, has been recognized by the Sentencing Commission as a reason to vary (or depart) downwards from the guidelines.

The 2024 amendment to U.S.S.G. §5H1.1 states:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense **or prior offenses**. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

(Emphasis added).

The reason for the amendment discusses the knowledge that individuals at the age of 22 simply do not have the same risk analysis, impulse control, or logical reasoning, and thus *culpability*, that older adults have.

> In line with the Commission's statutory duty to establish sentencing policies that reflect "advancement in knowledge of human behavior as it relates to the criminal justice process," 28 U.S.C. § 991(b)(1)(C), this amendment reflects the evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability.

6

United States Sentencing Commission, Amendments to the Sentencing Guidelines, §5H1.1 (April 30, 2024).

And yet, despite the widespread recognition that someone at the age of 20 is less likely to understand the repercussions of their actions, more likely to engage in risky behavior, and with the added trauma of an interrupted childhood, Mr. Knight's actions at this young age have labeled him not only as a criminal, but also opened him up to the exposure of a 15-year mandatory minimum sentence, if not for the benefit of a plea, but such behavior will likely be used to describe him to the Court as a dangerous man and undeserving of redemption.[10]

### *A LOST MAN*: THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Undoubtedly the Government will paint Mr. Knight as a dangerous, scary villain in this story. A drug dealer, who introduced others to his connections[11] and who doled out piles of narcotics out of a drug den he built in a seedy motel room. But that myopic painting misses many colors and shades which show the whole picture.

Mr. Knight was living in the same small motel room where he stored drugs. Although marginally living with his older brother, who as indicated above, is himself in and out of trouble with the law, Mr. Knight for all intents and purposes called home a Quality Inn that most people do not find suitable to even stay a night. (See next page for a description of Mr. Knight's home).

As discussed above, Mr. Knight had no education past the 10th grade, no skills or trade, and his only family in Roanoke was a felon involved in drug distribution. Mr. Knight, although likely painted as a big player in the Roanoke drug scene by the Government, was just a man lost and trying to survive. Despite her protestations otherwise, Mr. Knight was living in the Quality

---

[10] Indeed, even probation at ECF No. 35 at p. 25 recognizes that age is of particular relevance in Mr. Knight's case, stating, "[t]he defendant was 26 years of age when the instant offense was committed. Knight has multiple prior scored criminal history convictions, however, they all occurred when he was either 20 or 22 years of age."

[11] There are concerns with the relevance and reliability of this evidence.

Inn with his girlfriend, Ms. Saunders, who gave birth to Mr. Knight's child while he has been in

jail.



Mr. Knight's offense and the amount found on him was serious, but he is **not** a kingpin

**nor** a man trying to get rich. He was a man trying to live.

### THE GOVERNMENT'S OBJECTIONS AND PROBATION'S INCLUSION OF THE GUN ENHANCEMENT IS IMPROPER AND SHOULD NOT BE INCLUDED

Defense maintains its arguments against Government's objections to the PSR and

reserves the right to respond to any arguments made in Government's memorandum regarding

these objections.

Government and probation argue that pursuant to USSG §2D1.1(b)(1), a 2-point gun

enhancement should be added to Mr. Knight's sentencing guidelines. Although USSG §2D1.1 n.

11 states that "[t]he enhancement should be applied if the weapon was present, unless it is clearly

improbable that the weapon was connected with the offense," the gun was not present as it

---

[12] Some reviews of the lush location Mr. Knight's lifestyle afforded him.

pertains to Mr. Knight's conviction. While it is true that Mr. Knight agreed to the enhancement for "maintain a presence for distributing a controlled substance," that is because Mr. Knight was living in the Quality Inn and therefore necessarily keeping controlled substances and related items in the small motel room in which he was living. Ms. Saunders, however, was also living in that motel room. And while she stated the firearm was not hers,[13] Ms. Saunders also lied about her relationship with Mr. Knight, pretending not to know him despite their clear relationship and her living arrangements with Mr. Knight. The gun was indeed found in her purse, and she lived in the same small room with Mr. Knight. In fact, USSG §2D1.1 n. 11 specifically contemplates a situation in which a gun found in someone's home should not be used to apply the enhancement: "For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet." The gun was found in Ms. Saunders' purse, in the motel room she resided in with Mr. Knight on a different day than the day Mr. Knight was caught with controlled substances. Mr. Knight should not be liable for this enhancement.

### THE COURT SHOULD ALLOW MR. KNIGHT THE BENEFIT OF HIS AGREEMENT WITH THE GOVERNMENT

Although Mr. Knight disagrees with the inclusion of the gun enhancement, even if the Court takes such an enhancement into account, the JSIN data is clear – the average person, all other things being equal, receives less than the guidelines – 134 to 135 months in prison. This is 15 months less than the low-end of Mr. Knight's plea. Still the plea gives Mr. Knight the benefit of dipping below the guidelines with the gun enhancement and into the mid-level of his current guidelines and the Government receives the benefit of sentencing Mr. Knight above the average

---

[13] It does not take a legal scholar to divine why Ms. Saunders might lie about ownership of a gun found in her purse.

person in Mr. Knight's shoes. If anything, although below the guidelines as contemplated by probation, the range within the plea gives the Government the biggest benefit.

Even if the Court takes the defense's view and agrees that the gun enhancement should not be applicable, his guidelines would be 135-168 months, the agreed-upon plea encompasses the midrange of these guidelines to slightly higher.

### ANY MORE TIME OVER 150 MONTHS IS UNNECCESSARY AND BENEFITS NO ONE, INCLUDING MR. KNIGHT, SOCIETY, AND THE PURPOSES OF JUSTICE

It is well-known and settled in the field of criminal justice research that increasing the severity of punishment does not deter crime and can often make recidivism worse.[14] In fact, studies show that shorter sentences tend to lead to specific deterrence, but this is not true of longer sentences.[15] The fact that harsher punishments and more time in prison doesn't just raise the likelihood that people will commit future crimes,[16] but in many cases doesn't even meet the goal of incapacitation – specifically with drug crimes, which often just opens a hole that is filled with someone new[17] (where there is demand, supply will be met.) The utter failure of long imprisonment times failing to deter crime or meet the goals of punishment is not just an argument created by Defense attorneys or studied in the ivory towers of academia, the DOJ through the National Institute of Justice recognizes this as well.[18]

---

[14] Ben Johnson, *Do Criminal Laws Deter Crime? Deterrence Theory in Criminal Justice Policy: A Primer*, MN HOUSE RESEARCH, January 2019, https://house.mn.gov/hrd/pubs/deterrence.pdf, "Studies indicate that individuals punished more severely commit more crimes in the future."

[15] *Id* at pg 6.

[16] Jamie Santa Cruz, *Rethinking Prison as a Deterrent to Future Crime*, JSTOR DAILY, Jul. 18, 2022, https://daily.jstor.org/rethinking-prison-as-a-deterrent-to-future-crime/.

[17] William R. Kelly, *Why Punishment Doesn't Reduce Crime*, PSYCHOLOGY TODAY, Apr. 25, 2018, https://www.psychologytoday.com/us/blog/crime-and-punishment/201804/why-punishment-doesnt-reduce-crime.

[18] National Institute of Justice, Five Things About Deterrence, May 2016, https://nij.ojp.gov/topics/articles/fivethings-about-deterrence.

So, what does deter crime? The certainty of being caught[19] and as some evidence suggests, short jail stints of prison time.[20]

Any time over the minimum 12.5 years that Mr. Knight will be required to serve, given the plea, does nothing further to specifically or generally deter these crimes[21], and Mr. Knight will be removed from the community for so long, that the goals of incapacitation and protection of society will no longer need to be met.

Mr. Knight is still a relatively young man and while Government may argue that Mr. Knight's past drug crimes require a significant amount of time (ignoring the incomprehensible amount of time 12.5 years is to someone facing such a long time in prison), but as described above, those crimes Mr. Knight committed were not because Mr. Knight wanted to skirt the law – they were committed by a young, naive, hopeless man.

The only thing that will ensure Mr. Knight comes out of a prison term and reintegrates into society is to rehabilitate and guide the young Jeffrey Knight who was never given a map to a successful life. More prison time does not do that. It is the rehabilitative services Mr. Knight can receive outside of prison: substance abuse counseling, education, training, and reentry services, that the sooner he can receive the better.

Any more time than 150 months, over a decade, is just punishment for punishment's sake – further obscuring any path that can lead Mr. Knight out of the murky life that was set out for him.

**CONCLUSION: A WAY OUT**

---

[19] *Id*.

[20] *Supra* note 16.

[21] Additionally, regardless of the amount of time Mr. Knight serves for this charge, should he recidivate after this charge, he will be considered a career offender – a label carrying with it such a significant amount of time that it alone should be enough to deter Mr. Knight from ever reoffending.

Lost as a boy, shuffled from family member to member, many of whom were in trouble with the law, never provided with a guiding light, it is no wonder Mr. Knight was lost as a young man. It is not that he took the easy way out with his behavior – his life has been incredibly hard. He took the only route modeled for him. He still has a very long way to go – over a decade behind prison gates and bars, but by giving him 150 months, still over the average most offenders, all other things being equal, receive, but at the low end of his plea, Mr. Knight will be given a small light to find his way.

Respectfully Submitted,

Jeffrey Knight
By Counsel

Beatrice F. Diehl, Esq.

FL Bar No.: 0124667

Assistant Federal Public Defender
Office of the Federal Public Defender
Western District of Virginia
Roanoke, VA, 24011
Ph. (540) 777-0891
Beatrice_diehl@fd.org

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing was electronically filed and will be forwarded to the Assistant United States Attorney, this 31st day of March 2025.